**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| EDWARD ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 08-952 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| EQUITABLE RESOURCES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I.    Introduction**

This is an employment discrimination case brought by Edward Anderson ("Plaintiff" or "Anderson") against his former employer, Equitable Resources, Inc. ("Defendant" or "Equitable"), a natural gas utility.  Plaintiff asserts that he was terminated by Defendant due to his race (African American) and his age (51 at the time of his termination), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1) ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623, *et seq.* ("ADEA").  Defendant claims that Plaintiff was fired for violating its employee policies by performing private work for an Equitable customer and by stealing Defendant's property.  This matter is before the Court on Defendant's Motion for Summary Judgment.  (Docket No. 22).

The question for the Court is whether summary judgment is appropriate when the terminated employee does not deny violating his former employer's policies but rather alleges that improper discrimination motivated the employer to apply the policies to him.  Upon consideration of the parties' submissions and for the reasons given below, the Court holds that,

given the lack of evidence showing discrimination or impugning Defendant's choice to enforce its policies, Defendant's motion will be GRANTED.

## II.    Procedural History

Plaintiff filed a Complaint against Defendant on July 8, 2008, alleging one count of racial discrimination in violation of Title VII and one count of age discrimination in violation of the ADEA.  (Docket No. 1).  On September 5, 2008, Defendant filed an Answer denying both counts and raising various affirmative defenses.  (Docket No. 7).

On November 3, 2008, this Court referred the case to mediation (Docket No. 16), but the mediation did not result in a settlement of the case (Docket No. 17), and discovery proceeded. On July 23, 2009, one month after the close of discovery, Defendant filed the instant Motion for Summary Judgment, with its accompanying Concise Statement of Material Facts, Brief in Support, and Appendix.  (Docket Nos. 22-25).  On August 24, 2009, Plaintiff filed his Response and Brief in opposition to the motion, his Response to Defendant's Concise Statement of Material Facts (with an Appendix), and his own Concise Statement of Material Facts with a supporting Appendix.  (Docket Nos. 26-31).  Lastly, on September 4, 2009, Defendant filed a Reply Brief, a Response to Plaintiff's Concise Statement of Material Facts, and a Supplement to its Appendix. (Docket Nos. 32-34).  Plaintiff did not seek the leave of the Court to file a Sur-Reply and the deadline for doing so has now passed. (*See* Docket No. 21).

Thus, the matter is fully briefed and Defendant's Motion for Summary Judgment is ripe for disposition.

## III.    Factual Background

Unless otherwise indicated, the following facts are uncontested.

### A.    *Plaintiff's Employment History and Status*

2

Plaintiff Anderson is an African-American man who was employed by Defendant as a Customer Serviceman. (Docket Nos. 23 at ¶1; 28 at ¶1). Defendant fired Plaintiff on August 19, 2005 (Docket No. 25-3 at 18). At that time, Plaintiff was 51 years old. (Docket Nos. 30 at ¶38; 33 at ¶38). Anderson worked at Equitable for over twenty seven (27) years. (Docket Nos. 30 at ¶38; 33 at ¶38). Over the course of that period, he was subject to discipline on four different occasions, although none of them are adduced by Defendant as reasons for his termination.[1] (Docket Nos. 23 at ¶4; 28 at ¶4).

While he was employed by Equitable, Anderson also performed work as a private plumber. (Docket Nos. 23 at ¶5; 28 at ¶5). Defendant characterizes this as being "self-employed as a private plumber." (Docket No. 23 at ¶5). Plaintiff describes it differently, stating that "with the exception of doing gas lines, he performed plumbing work, 'off and on' and 'here and there' as 'side work,'" and testified that he thought approximately 350 other employees at Equitable were also performing "side work." (Docket No. 28 at ¶5).

In August or September of 2005, around the time of Plaintiff's termination, Equitable reached a collective bargaining agreement with Plaintiff's union. (Docket Nos. 30 at ¶33; 33 at ¶33). As part of that agreement, the terms of the employees' pension benefits changed and employees were given three retirement benefits options, one of which was a "rollover program"

---

[1]

In 1992, Anderson was suspended for three days for an altercation with a police officer during working hours; in 1995, he was disciplined for loss of company equipment; in 1997, he was disciplined for unauthorized use of company property for his personal business; and in 2001, he received a written warning for unprofessional behavior in the workplace. (Docket Nos 23 at ¶4; 28 at ¶4). Plaintiff characterizes these as "dated and minor warnings" and explains them in greater detail (notably pointing out that the "unauthorized use of company property" warning–conduct similar to that to which Equitable points for his eventual termination–was for listing his company-issued pager number on his personal business cards). (Docket No. 28 at ¶4).

allowing employees to roll their defined benefits into a 401K account, an option for which an "additional three years of age and an additional three years of service was offered for purposes of calculating the benefit." (Docket Nos. 30 at ¶¶35-7; 33 at ¶¶35-7). With those additional years credited to him, Plaintiff would have been able to retire with a full pension almost immediately. (Docket Nos. 30 at ¶38; 33 at ¶38). At the time of Anderson's termination, Defendant was in the process of eliminating positions like his through attrition and was not hiring people to replace employees from Anderson's bargaining unit who left the company. (Docket Nos. 30 at ¶¶32-3; 33 at ¶¶32-3).

### B.    *The Greentree Road Property*

Defendant contends that Plaintiff was fired for misconduct surrounding an incident at a customer's property on Greentree Road in Pittsburgh, Pennsylvania. (Docket Nos. 30 at ¶17; 33 at ¶17). In March 2005, Plaintiff responded to a call from the owner of the Greentree Road property, a customer of Defendant, requesting advice from Equitable about moving the gas meter from one location to another to facilitate improvements to the property. (Docket Nos. 23 at ¶¶16-18; 28 at ¶¶16-18). Because the work involved moving both the gas meter, owned by Equitable, and the gas service line pipes, owned by the customer, Anderson told him that he would have to hire an independent plumber to move the pipes. (Docket Nos. 23 at ¶19; 28 at ¶19). After the property owner chose an independent plumber, Plaintiff, as part of his employment with Equitable, spoke to the plumber about how to do the work. (Docket Nos. 23 at ¶20; 28 at ¶20).

However, when Plaintiff drove by the Greentree Road property in July, 2005, he noticed that the meter had not yet been moved and spoke to the owner who told him that he had not arranged with the plumber to do the work. (Docket Nos. 23 at ¶¶21-3; 28 at ¶¶21-3). The next day, Plaintiff returned to the Greentree Road property and offered to do the work himself as an

independent plumber, was hired to do so, and began the job. (Docket Nos. 23 at ¶¶24-5; 28 at ¶¶24-5).  In the course of the work, Plaintiff noticed a leak in the main gas line and called his employer, who sent out Don Patton, another Equitable Customer Serviceman, to inspect it, which he did before calling an Equitable street crew to repair it.  (Docket Nos. 23 at ¶¶25-6; 28 at ¶¶25-6).  Plaintiff notes that at the time neither Patton nor anyone else from Equitable expressed any concern with the fact that Plaintiff was doing private work for an Equitable customer. (Docket No. 28 at ¶26).

Subsequently, on July 26, 2005, Anderson did more work at the Greentree Road property before leaving to report for work at 4:00 p.m. (Docket Nos. 23 at ¶¶27-8; 28 at 27-8).  On his way, he called Equitable to request a service line inspection,[2] and specifically requested that Joe Haines, another Equitable Customer Serviceman be assigned to inspect it.  (Docket Nos. 23 at ¶¶29-30; 28 at ¶¶29-30).  When he arrived at work, Plaintiff spoke to Haines and told him to expect a service call and that he, Anderson, had done the work.  (Docket Nos. 23 at ¶31; 28 at ¶31).[3]  Plaintiff was not at the Greentree Road property when Haines performed his inspection, but his adult nephew, who had been assisting Plaintiff, was; his nephew met Haines and provided him with the OQ Identification number "EA4518" for the work.  (Docket Nos. 23 at ¶¶ 32-3; 28 at ¶¶32-3).

---

[2]

Someone from the gas company must inspect the line before the gas company will put it into service. (Docket No. 23 at n. 7)

[3]

The parties dispute what exactly Plaintiff told Haines, including the exact description of the work done (whether the gas meter was moved from outside to inside or whether it was always inside), and whether Plaintiff told Haines that his supervisor, Mackin, had approved *him* to do the work or that Mackin had simply approved that the work be done. (Docket Nos. 24 at ¶¶30-3; 28 at ¶¶30-3)

An "OQ number" is an identification number issued to independent plumbers who have completed the Operator Qualification training required to be qualified to work on natural gas lines. (Docket Nos. 23 at ¶¶7-8; 28 ¶¶7-8). Defendant issued "OQ cards" with OQ numbers to plumbers who had completed Equitable's own OQ training program, and made it a policy *not* to issue them to its own employees. (Docket Nos. 23 at ¶¶9-10; 28 at ¶¶9-10). The format for Equitable's OQ numbers was (plumber's initials) + (four digits from the plumber's social security number), the format of the number provided by Plaintiff's nephew. (Docket Nos. 23 at ¶33; 28 at ¶33). Defendant claims that only plumbers with Equitable OQ cards were allowed to perform work on gas lines connected to Equitable's system. (Docket Nos. 23 at ¶¶9, 15; 28 at ¶¶9, 15). Plaintiff contends that Equitable regularly accepted OQ cards issued by other companies; that, when he performed inspections of others' work, he had been told to accept and had accepted OQ cards issued by another company's Operator Qualification program; and that soon after the incident at issue, on July 29, 2005, Equitable announced that as of August 1, 2005 it would accept numbers from "Utility Technology International Corporation's (UTI) Plumber/Installer Operator Qualification program," the company that had issued Plaintiff's OQ card. (*Id.*). Defendant contends that by having his nephew provide an OQ number to Haines, Plaintiff falsely represented that he had an Equitable OQ card; Plaintiff contends that since everyone knew that Equitable employees did not have Equitable OQ cards, he was not intending to nor did he mislead Haines. (Docket Nos. 30 at ¶4; 33 at ¶4).

Subsequently, a leak developed in the gas line at the Greentree Road property and on August 4, 2005 Jack Mackin, Customer Service Foreman and Anderson's direct supervisor, and Charles Simon, Maintenance Manager and Mackin's supervisor, responded, as did an Equitable

street crew.[4]  (Docket Nos. 23 at ¶¶35-6; 28 at ¶¶35-6).  At the Greentree Road property, some

bags of pipe fittings and other materials were found, bearing labels that indicated that they were

from U.S. Flow (a supplier for Equitable) and were "for Equitable Gas."  (Docket Nos. 23 at ¶38;

28 at ¶28).  The evidence concerning these bags is highly contested.  Defendant contends that

Simon collected the bags and used the purchase orders on them to determine that they had been

issued by Equitable to Plaintiff's customer service van, but Plaintiff points out that this is based

on the testimony of Robert Frankhouser, Equitable's Senior Human Resources Business Partner,

and that Simon himself denies taking charge of the bags.  (Docket Nos. 23 at ¶39; 28 at ¶39).

Plaintiff contends that he originally acquired the bags by recovering them from a dumpster when

Equitable was moving from and cleaning out its South Side location, that he thought doing so

was not a problem since they had been thrown away, and that others had done the same thing.

(Docket No. 28 at ¶41).

Subsequently, Equitable conducted an investigation into the work performed at the

Greentree Road property.  (Docket Nos. 23 at ¶42; 28 at ¶42).  In the course of this investigation,

numerous people were interviewed, including Don Patton, the owner of the Greentree Road

property, members of the street crew, Haines, and Anderson himself.  (Docket Nos. 23 at ¶45; 28

at ¶45).  The findings from these interviews are contested by Plaintiff, who argues that the

discovery production surrounding them is incomplete and contradictory.  (Docket No. 28 at ¶45).

During the course of his interview, Plaintiff admitted that he had installed the gas service

line and done other work at the Greentree Road property, and he further admitted that he had

---

[4]

Plaintiff states that the leak involved a valve installed by Equitable and had nothing to do
with his plumbing work; Defendant does not specify the location or nature of the leak. (Docket Nos.
23 at ¶35; 28 at ¶35).

done similar private contract plumbing work for Equitable customers in the past.  (Docket Nos. 23 at ¶¶47-8; 28 at ¶¶47-8).  Plaintiff contends that this is because it was a routine practice, and points out that Defendant did not investigate his past work any further, which he considers "consistent with Equitable's acquiescence" to such work.  (Docket No. 28 at ¶48).  In that same vein, Plaintiff points to the testimony of Haines  who testified that he had done other work where the private plumber was an Equitable employee and that there was "a culture of how it took place." (Docket No. 28 at ¶33).

### C.    Defendant's Policies & Employment Practices

### 1.    Defendant's Official Policies

Three of Equitable's official policies are implicated in the present case.  The first is Defendant's policy that it would not issue OQ cards to its own employees discussed *supra*.  That policy is, in part, a means of implementing the second policy at issue: Defendant's Conflicts of Interest Policy.  Equitable had a general Conflicts of Interest Policy (Docket No. 25-7 at 2-8) effective at the time of the events at issue in this case.  In relevant part, it states that:

> **I.**    **Conflicts of Interest.** *Business Relationships*. No director, officer or employee, without the prior approval of the Company shall directly or indirectly (i) enter into any arrangement involving remuneration, profit or non-monetary benefit . . . to such director, officer or employee from . . . any person, organization, concern, or corporation:
>
> A.    Which sells or seeks to sell, purchases or seeks to purchase, goods, materials, supplies, natural gas and/or energy-related services, or other services to, or from, the Company
>        . . . .
> Requests for prior approval must be submitted in writing with complete disclosure in accordance with the procedures described in Section II of this Policy.

(Docket No. 25-7).  Defendant states that it considered this to forbid Equitable employees from performing private plumbing work on gas service lines for its customers.  (Docket No. 23 at

¶11).  Plaintiff contends, however, that this policy was not regularly applied to Equitable employees performing independent plumbing work for Equitable customers, and points out that Frankhouser testified that there was no more specific policy that applied and that he did not know of any plumbers or other workers requesting permission pursuant to the policy. (Docket No. 28 at ¶11).

The third policy at issue is Defendant's Working For Others policy.  In its termination letter to Plaintiff, Defendant lists one of the reasons as his violation of the Working for Others policy, which reads, in relevant part:

> A.    An employee shall not engage in any of the following activities:
>    1.    During working hours perform or solicit outside employment for himself/herself, for any other employee, or any other person.

(Docket Nos. 30 at ¶12; 33 at ¶12).  Plaintiff contends that this was inappropriately applied to him since he did not perform or solicit any work during working hours; Defendant contends that Plaintiff's work at the Greentree Road property derived improperly from his work as an Equitable employee.  (Docket Nos. 30 at ¶¶13-4; 33 at ¶¶13-4).

    *2.    Defendant's Unofficial Practices*

Plaintiff alleges a lengthy, but vague history of minor discriminatory acts he has experienced while he was employed at Equitable.  He asserts that he was the subject of racist comments that occurred in the preceding 25 years, but does not claim that any relate to the immediate incident. (Docket No. 25-3 at 23).  Plaintiff testified that he is unable to recall any specific incidents of racially motivated remarks beyond generally stating that remarks of that nature may have occurred over a period of years.  *Id.* Additionally, Plaintiff makes broad generalizations in his deposition asserting that younger men received more training and were promoted at a greater rate than older employees. (Docket No. 25-3 at 25). However, this

9

assertion also lacks details and Plaintiff does not specify the number of individuals, their ages, or reasons why he believes they were promoted before him. (*Id.*)

Between January 2003 and December 2006, Defendant fired 24 employees, including Plaintiff, for reasons similar to those it offered for firing Plaintiff, of whom 15 were white and 10 were younger than 40 years old. (Docket Nos. 23 at ¶¶57-9; 28 at ¶¶57-9). Plaintiff points out that 12 of those terminated were meter readers fired by a different supervisor than he was, following an investigation into misconduct in the meter reader department, and that two others were in very different positions from Plaintiff (paralegal, and operations supervisor). (Docket No. 28 at ¶57). Plaintiff also contends that there were six employees terminated who were more similarly situated to him in that they were supervised and eventually terminated by Simon[5] and were over 40 years old or were African-Americans. (Docket Nos. 28 at ¶57; 30 at ¶¶25-30). Defendant points out in response that each of these former employees was terminated for particular, specified reasons and that over 82% of its customer servicemen were over 40 years old at the time. (Docket No. 33 at ¶¶25-30).

Plaintiff also adduces three examples of employees who were not terminated despite supposedly similar conduct. First, in 2002, James Seykoski, a white male, age 46, was captured on videotape stealing gas from Equitable but was not terminated; Defendant contends that Seykoski was not terminated because the video tape would not be admissible in arbitration and the video cameras had been installed without bargaining with the union, subjecting Equitable to a potential unfair labor practice charge. (Docket Nos. 30 at ¶¶19-21; 33 at ¶¶19-21). Second, in 1989, Robert Lenhart, a white male, age 45, was suspended for fifty days and not terminated for

---

[5]

Defendant denies that Simon terminated one of these employees. (Docket No 28 at ¶29).

falsifying records and violating the Company's rule prohibiting solicitation of service line work. (Docket Nos. 30 at ¶¶22-3; 33 at ¶¶22-3).  Third, in 2004, Thomas Strellec was given a Last Chance Agreement and not fired, despite having been suspended on 12 prior occasions and having been issued multiple warnings; Defendant points out that Strellec's disciplinary history was largely related to instances of negligence and workplace accidents, not intentional misconduct. (Docket Nos. 30 at ¶24; 33 at ¶24).

###     D.    *Equitable's Termination of Anderson*

After the investigation into the events at the Greentree Road property, Defendant fired Plaintiff on August 19, 2005. (Docket Nos. 23 at ¶52; 28 at ¶52).  In the termination letter, Equitable provided the following reasons for the termination:

- Intentional misrepresentation of information to an Equitable customer, supervisor and various employees by:
    - Representing yourself as an approved Equitable plumber (i.e., informing Equitable employees that you had a "card" and providing them with a fabricated OQ Card identification number)
    - Informing Mr. Haines that supervisor Mackin gave you permission to complete the service line renewal and had approved the work at the Work Location
    - Informing Supervisor Mackin that the customer's meter at the Work Location was an inside set and asking for approval to leave the meter inside when in fact the meter was outside;
- Theft of company material;
- Violation of Equitable's "Working for Other" and "Conflicts of Interest" policies;
- Intentional misrepresentation of facts to Company officials in the course of an investigation.

(Docket No. 25-3 at 29).

After his termination, Plaintiff filed a grievance with his union, which Defendant denied, and the union did not appeal to arbitration.  (Docket Nos. 23 at ¶¶53-4; 28 at ¶¶53-4).  Anderson also filed a complaint with the City of Pittsburgh Commission on Human Relations, which

issued a "lack of probable cause" finding and closed the case on September 12, 2006.  (Docket Nos. 23 at ¶¶55-6; 28 at ¶¶55-6).

### IV.    Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure of material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In deciding a summary judgment motion, the court must "'view the evidence . . . through the prism of the substantive evidentiary burden' to determine 'whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.'"  *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, then the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co.*, 998 F.3d 1224, 1230 (3d Cir. 1993).  Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue of fact for trial."  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.2d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

12

In considering a motion for summary judgment, a district court may not "make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [its] favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001) (holding that "a court must take the facts in the light most favorable to the nonmoving party, the [plaintiff], and draw all reasonable inferences in their favor" (citation omitted)).

## V.   Discussion

### A.      *Plaintiff's Title VII Claim*

To prove racial discrimination under Title VII at trial, Plaintiff must prove by a preponderance of the evidence that Defendant's "'proffered reason was not the true reason for the employment decision,' and that race was." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993) (quoting *Texas Dept. of Community Affairs v. Burdine* 450 U.S 248, 255 (1981)). In the course of determining whether Plaintiff has done so, a district court undertakes the familiar burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Parker v. Verizon Pennsylvania, Inc.*, 309 Fed App'x 551, 555 (3d Cir. 2009) (not precedential). First, the employee bears the burden of establishing a prima facie case by producing evidence "that: (1) he belongs to a [protected class]; (2) he was qualified for the position; (3) he was discharged; and (4) other employees not in a protected class were treated more favorably." *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d. Cir. 1993) (citing *Jackson v. Univ. of Pittsburgh,* 826 F.2d 230, 233 (3d. Cir. 1987)). Then, the burden of production shifts to the employer to articulate some "legitimate nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. Once the employer has

13

done so, the burden shifts back to the employee to demonstrate that the employer's proffered reason "was in fact pretext"[6] (*Id.* at 804), which he can do by submitting evidence which "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely then [sic] not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie,* 32 F.3d 759, 762 (1994).  In this case, the first two steps of the *McDonnell Douglas* analysis are straightforward, but the third requires further analysis.

It is undisputed that Mr. Anderson is an African-American and therefore a member of a protected class for Title VII purposes. (Docket Nos. 23 at ¶1; 28 at ¶1).  It is also undisputed that Plaintiff was terminated and that he was qualified for the position, as he had been employed by Equitable as a Customer Serviceman for 27 years prior to his termination. (Docket Nos. 30 at ¶38; 33 at ¶38)).  Plaintiff has presented evidence that others not in the protected classes were treated differently, and though Defendant disputes the interpretation of that evidence, viewed in the light most favorable to Plaintiff, it is sufficient for a reasonable jury to find that those others were treated more favorably.  Therefore, Plaintiff has established a prima facie case and the burden shifts to the Defendant to articulate a legitimate nondiscriminatory reason for Anderson's termination.  *McDonnell Douglas,* 411 U.S. at 802.

---

[6]

As an initial matter, the Court notes that the parties agree (Docket Nos. 24 at 6; 27 at 3) that the *McDonnell Douglass* analysis applies, and the pleadings suggest that this is a "pretext" case rather than a "mixed motives" one.  *See*, *E.E.O.C. v. Aldi, Inc.*, Civ. A. No. 06-1210, 2009 WL 3183077, 10-12 (W.D.Pa., Sep. 30, 2009).  Therefore, the Court does not consider the Title VII claim using the "mixed motives" analysis found in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Defendant maintains that Plaintiff's termination was due to professional misconduct and violations of Equitable's policies, and has presented evidence to that end. Because Title VII does not require an employer to retain an employee who has acted in an unprofessional manner, the reasons articulated by Defendant are sufficient to meet its burden of production under the second step of the *McDonnell Douglas* analysis and to shift the burden back to the Plaintiff to demonstrate pretext in the final step. *McDonnell Douglas*, 411 U.S. at 803-804.

In *Fuentes,* the United States Court of Appeals for the Third Circuit held that a plaintiff in a Title VII case can meet this burden and defeat a motion for summary judgment by "*either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d, 764; *see also Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981) ("[Plaintiff] may succeed in this either by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.") The Court will consider each of these methods as well as considering whether some combination of the two suffices to meet Plaintiff's burden.

1.    *FUENTES* PRONG 1, DISCREDITING THE PROFFERED REASONS

The first prong of *Fuentes* allows the Plaintiff to rebut Defendant's proffered reasons for his termination by attacking the reasons themselves. In order to "cast[] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication," a plaintiff must show some evidence that would cause a factfinder to disbelieve it. *Fuentes*, 32 F.3d at 759. It is not enough to show that the decision to terminate him was a bad business decision or an incompetent application of the

15

employer's policies. *Atkinson v. Lafayette College*, 460 F.3d 447, 451 (3d Cir. 2006) ("the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."); *Money v. Provident Mutual Life Ins. Co.* 189 Fed. App'x 114, 116 (3d Cir. 2006) ("Even if [the employer's] decision was imprudent, unwise, and incompetent, a merely bad employment decision is not actionable."). If, as here, "the defendant proffers a bagful of legitimate reasons," the "employee need not always offer sufficient evidence to discredit all of the rationales," since casting doubt on a "fair number of them" may mean that he need not discredit the remainder. *Tomasso v. Boeing*, 445 F.3d 702, 707 (3d. Cir 2006) (*quoting Fuentes*, 32 F.3d at 764 n.7). To discredit a defendant's proffered reasons, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (emphasis in original, internal quotations omitted). This can logically include both internal contradictions and inconsistencies among the reasons themselves and external contradictions with the facts or Defendant's past practices.[7]

Defendant argues that no reasonable factfinder could "reasonably disbelieve Equitable's legitimate, non-discriminatory reasons for [Anderson's] discharge." (Document 24 at 10). And, indeed, the evidence is clear that Equitable had policies governing employee conduct and had

---

[7]
Defendant correctly argues that the issue is not whether Plaintiff "actually committed any of the misconduct in question" but rather whether he has proffered "specific facts from which a fact finder could reasonably conclude that the stated reasons were pretextual." (Docket No. 32 at 4). Thus, without inquiring whether Plaintiff actually committed the acts violating the policies, the Court must consider whether the sum of the evidence, considered in the light most favorable to Plaintiff, could make a factfinder question whether Defendant's *belief* that he had violated them was reasonable.

good reason to believe that Plaintiff's work at the Greentree Road property violated some of those policies.  In particular, it appears that Plaintiff violated the Conflicts of Interest policy. The Equitable Conflict of Interest FAQ supplement describes one type of potential conflict of interest that must be disclosed as follows: "Barney is a company technician who would freelance to provide related services to company customers in his spare time." (Docket No. 25-7 at 6). Barney's hypothetical situation is analogous to the immediate situation.  Equitable's Conflict of Interest policy also clearly states that failure to adhere to the articulated guidelines could result in "disciplinary action, including termination of employment." (*Id.* at 4).  Given the results of its investigation, Defendant also had good reason to believe that Plaintiff had stolen and used supplies from the company in his work at the Greentree Road property.

Plaintiff argues that the Conflicts of Interest policy was not regularly applied to employees performing independent plumbing work for Equitable customers.  (Docket No. 27 at 4).  To show this, he relies on his own statements to that effect and the testimony of Haines who testified that "there was a culture of how it took place," and that he remembered "three, four tops" other situations in his experience where the private plumber was an Equitable employee. (Docket Nos. 28 at ¶33; 31-5 at 3).  However, Haines also testified that the "gas company management was never aware" of the other instances when this occurred. (Docket No. 31-5 at 3). Since Plaintiff does not produce evidence of any other situations where the Conflicts of Interest policy could have been applied but was not, and since the uncontested testimony is that Defendant was not aware of any such situations, Plaintiff has not discredited this proffered reason.

Plaintiff argues that he has cast doubt on Defendant's next proffered reason, his alleged theft of company property, because he has an alternate explanation for his possession of the bags

17

of Equitable property, creating a credibility question for the jury to decide.  (Docket No. 27 at 7) ("Equitable does not believe Anderson and they argue that others should not as well."). However, Plaintiff is incorrect as to what must be shown.  Defendant is not required to show that it was correct in its belief that Plaintiff stole the property, only that it was reasonable for it to have believed as it did.  The onus is then on Plaintiff to "cast[] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication."  *Fuentes*, 32 F.3d at 759.  Merely showing that Equitable may have been wrong in its conclusion does not cast sufficient doubt, since the conclusion itself is reasonable.  *See Atkinson v. Lafayette College*, 460 F.3d at 451; *Money v. Provident Mutual Life Ins. Co.* 189 Fed. App'x at 116 (even unsound, imprudent, unwise, and incompetent employment decisions are not actionable).

Plaintiff does cast some doubt on the other reasons that Equitable offered in its termination letter (violation of the Working for Others policy; intentional misrepresentation of information to an Equitable customer, supervisor, and various employees; and intentional misrepresentation of facts to Company officials in the course of an investigation).  For instance, by its terms, the Working for Others policy applies only to work done during an employee's working hours, and there is no evidence that Plaintiff did any private work while on the clock for Equitable.  (Docket Nos. 30 at ¶12, 33 at ¶12).

Considered in a light most favorable to the Plaintiff, the evidence adduced by Plaintiff could also cast doubt on Defendant's insistence that Anderson intentionally misrepresented information to Haines. Plaintiff argues that any statement to Haines regarding his authorization to perform the work or instructing him to use the false OQ number could not have been an attempt to deceive Haines, because both he and Haines knew that Equitable employees were not

authorized to do such work.[8] (Docket No. 27 at 6).   If everyone knew that Plaintiff was not authorized, it would be unreasonable for Defendant to suggest that he tried to misrepresent to Haines that he was (although, once again, it is unclear that anyone in a supervisory position above Haines knew of such past practices, so Defendant's belief that Plaintiff *had* misrepresented the truth to Haines could still be reasonable).

As for intentional misrepresentation of facts to Company officials in the course of an investigation, Plaintiff argues that, to the contrary, he was remarkably forthright during the investigation (admitting to the work at the Greentree Road property, the details surrounding it, and to prior instances of private work for Equitable customers).   (Docket No. 27 at 5-6). Plaintiff also points out that Equitable proffered this same reason when discharging six other employees whom he argues were similarly situated to him (see below), from which he argues that a "jury could reasonably infer a pattern of disbelieving those who are in the protected class." (Docket No. 27 at 10 n. 4).

Finally, Plaintiff contends that Equitable's proffered reasons have shifted and changed over the course of litigation, which could be evidence of pretext and a reason for a jury to disbelieve them. (Docket No. 27, 4-9). To this end, Plaintiff points out that certain alleged misrepresentations on his part (regarding the extent of Mackin's authorization of his work and the original location of the gas meter to be moved) are no longer being proffered by Defendant, and argues that a jury could infer from this that "Equitable's inability to substantiate these

---

[8]

Plaintiff essentially argues that although he told Haines, via his nephew, to use the false OQ *number*, that is not the same as leading Haines to believe that he had an Equitable OQ *card*, because he and Haines and everyone at Equitable knew that it was impossible for him to have an Equitable OQ *card* and it was common practice for Customer Servicemen like Plaintiff to do such work and to provide that type of OQ *number*. (Docket No 27 at 5-6).

allegations (then or now) and their shift away from event [sic] trying to do so demonstrates their intent to discriminate against Anderson." (Docket No. 27 at 6).  Plaintiff also contends that the apparent abandonment of the Working for Others policy violation, which is not properly applied to him, is further evidence that the reasons were all pretext from the outset.

Even though it could be said that he has raised questions as to some of the reasons proffered by Defendant, Plaintiff has not called into question the reasonableness of the two central reasons for his termination: violating the Conflicts of Interest Policy, and apparent theft of property from Equitable.  As to those two, Defendant had good reason to believe that Plaintiff was in violation of company policies, and either one would be a legitimate grounds for termination.  The Court now turns to the question of whether the doubts raised as to some of the proffered reasons are sufficient to undermine the credibility of the Defendant and therefore to cause a reasonable jury to disbelieve the others.  *See Tomasso*, 445 F.3d at 707; *Fuentes*, 32 F.3d at 764 n.7.  In *Tomasso* the Court of Appeals for the Third Circuit overruled a grant of summary judgment because it found that the plaintiff had successfully "cast sufficient doubt on [his employer's] primary explanations for his layoff under *Fuentes*" and that the remaining rationales did not necessarily "adequately explain the decision to terminate him."  *Tomasso*, 445 F.3d at 710-11.  The opposite is true here.  Plaintiff has called into question some of Defendant's reasons, but the "primary explanations," which would themselves be adequate grounds for termination, he has not.  Therefore, Plaintiff has not succeeded in discrediting Defendant's proffered reasons.

2.    *Fuentes* Prong 2, Other Evidence of Discrimination

Alternately, the second prong of *Fuentes* allows the Plaintiff to rebut Defendant's proffered reasons for his termination not by discrediting the reasons themselves but by producing

sufficient other evidence of discrimination to suggest that, despite Defendant's proffered reasons, it was more likely than not a cause of his termination.  To do so, Plaintiff may rely on direct and circumstantial evidence (*Fuentes*, 32 F. 3d, 764) to show, for example, that "the employer has previously discriminated against [him], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998) (citing *Fuentes*, 32 F.3d at 765).

Plaintiff's direct evidence of discrimination is unconvincing.  He does not allege any specific instances of discriminatory acts or prejudice, and provides only vague recollections of racially motivated comments made at some point over the course of his 27 year employment. (Docket No. 25-3 at 23-5).  The Court does not consider this kind of vague allegation enough to show discrimination in this instance.  *See Fuentes*, 32 F.3d at 767 ("'Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.'" (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992))).

As circumstantial evidence, Plaintiff proffers evidence of Equitable's decisions to terminate or not to terminate other employees. (Docket Nos. 30 at ¶¶25-31; 33 at ¶¶ 25-31).  He argues that the Court should compare his treatment to the treatment of employees outside the protected class who were allegedly treated more leniently, as well as to the treatment of other employees in the protected class whom he contends were also subject to discrimination.  This evidence addresses two different means of showing discrimination: showing that other employees, not in the protected class, were treated differently even though they were similarly situated, and showing previous discrimination against members of the protected class.

21

A showing that other employees not in the protected class were "similarly situated" to the plaintiff but were treated differently can be sufficient evidence of discrimination to rebut an employer's proffered reasons (*Kay Jewelers*, 142 F.3d at 645), as can evidence of past discriminatory activity. *Fuentes*, 32 F.3d at 765; *see also Weldon v. Kraft, Inc.* 896 F.2d 793 (3d Cir. 1990) (agreeing with the plaintiff's argument that his own claims of racist treatment and that white employees would not have been treated the same, coupled with statistical evidence of arguably unfair treatment of black employees, was sufficient to discredit the defendant's proffered reasons).[9]

Defendant produced evidence regarding 24 employees, including Plaintiff, who were terminated between January 2003 and December 2006 for "theft of services, fraud, intentional misrepresentation or similar conduct," of whom 15 were white. (Docket Nos. 23 at ¶¶57-9; 28 at ¶¶57-9). The list of 24 employees displays variation in terms of race, age and gender. The list contains two African-American Customer Servicemen in addition to Anderson who were disciplined during the period, both of whom were reinstated after arbitration, unlike Anderson.

---

[9]

For the first method, the comparators who are not within the protected class and were allegedly treated differently must be "similarly situated," as described below. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F3d 639, 644-5 (3d Cir 1998). For the alternate method – showing that "the employer has previously discriminated against [plaintiff or] against other persons within the plaintiff's protected class or within another protected class" (*id.*) – some courts consider similarly situated comparators while others allow a more general inquiry into the employer's past practices. *See e.g. Cange v. Philadelphia Parking Authority*, Civ. A. No. 08-3480, 2009 WL 3540785 at *12 (E.D. Pa. October 30, 2009) ("[P]laintiff may show that the employer has previously discriminated against her, that the employer has previously discriminated against other *similarly-situated* members of the protected class or that defendant has treated more favorably similarly-situated people not within the protected class." (emphasis added)); *Simpson v. Kay Jewelers*, 142 F3d 639 (3d Cir 1998). As discussed below, the Court need not decide which set of comparators to use for the latter question since whichever set of employees is used, Plaintiff has not proffered sufficient evidence to show a pattern of discrimination.

*Id.*   If all 24 employees are considered, then clearly Plaintiff has not shown a pattern of discrimination.

Plaintiff contends that these 23 other employees are not similarly situated to him because they "held different positions in different departments, were supervised by different persons, and were terminated under dissimilar circumstances," and, therefore, are not proper comparators. (Docket No. 27 at 9-10).  Plaintiff proposes instead that his treatment should be compared to that of six other employees who were discharged for similar reasons, all of whom were responsible to and discharged by Simon.[10]   For further comparison, Plaintiff draws the Court's attention to three employees who were *not* terminated despite allegedly similar misconduct: James Seykoski, a white employee who was videotaped stealing gas from Equitable;   Robert Lenart, a white employee who was suspended for 50 days for soliciting line service work; and Thomas Strellec, a white employee who was given a Last Chance Agreement and not fired, despite having been suspended on 12 prior occasions and having been issued multiple warnings (Docket No. 30 at ¶¶19-24).   Defendant proffers that Seykoski was not terminated out of fear of a wrongful discharge suit and concerns about the use of the video tape in arbitration; that Lenart was

---

[10]

These six are: 1) James Ford, an African-American Customer Serviceman; 2) Ronald Grace, an African-American Truck Driver; 3) James Guy, an African-American Customer Serviceman (who is not included in Defendant's list of 24, presumably because he was terminated for negligence and safety-related reasons, rather than honesty-related ones, although "intentional misrepresentation of fact to Company officials in the course of an investigation" was one reason (Docket No. 33 at ¶27)); 4) Alan Welle Jr., a Caucasian Leak Surveyor; 5) James Lewis, an African American Utilityman (who was terminated, reinstated after arbitration and then terminated again three months later, and was actually terminated by Ralph Comito, not Simon); 6) and Timothy Finch, an African-American Customer Serviceman (who was also reinstated after arbitration). (Docket Nos. 25-8 at 11; 30 at ¶¶ 25-31; 33 at ¶¶25-31).

suspended in 1989; and that Strellec's disciplinary history was largely related to instances of negligence and workplace accidents, not intentional misconduct. (Docket No. 33 at ¶¶19-24).

Plaintiff's argument regarding this more limited selection of comparators also fails because he cannot show that the three non-terminated employees were similarly situated to him. In order to limit the list of comparators to these employees and former employees, Plaintiff relies on *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002), a Middle District of Pennsylvania case stating that "'[i]n order for employees to be deemed similarly situated, it has been determined that the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (quoting *Morris v. G.E. Financial Assurance Holdings*, Civ. A. No. 00-3849, 2001 WL 1558039, at *6 (E.D.Pa Dec. 3, 2001) (citing cases from the Eastern District of Pennsylvania, the D.C. Circuit and the Second Circuit)) (alteration in original). By these terms, Seykoski, Lenart, and Strellec are not similarly situated to Anderson since: Seykoski's situation has significant "differentiating and mitigating circumstances" for his non-termination; there is no evidence that Lenart was subject to the same standards twenty years ago as Plaintiff was when he was terminated;[11] and Strellec did not engage in the same conduct as Plaintiff.

Therefore, Plaintiff's proffer amounts to evidence that six employees besides himself, five black and one white, were similarly situated and were fired for misconduct similar to his

---

[11]

The Conflicts of Interest policy applied to the Plaintiff was effective in 1996, revised in 2005, and it replaced a previous policy that was effective in 1990. (Docket No. 25-7 at 2).

own.  Without any similarly situated employees outside the protected class who were *not* fired *despite* engaging in the same prohibited conduct, the Court cannot find that this evidence warrants an inference of discrimination or rebuts Defendant's proffered reasons for Plaintiff's termination.

Plaintiff also appears to argue that  the same employment data could be used to show a previous history of discrimination against members of the protected class.  In that context, the fact that five of the six dismissed employees were black may be relevant.  However, for each one, Defendant proffers legitimate reasons for the discharge which Plaintiff has not rebutted and gives no specific reasons to doubt (Docket No. 33 at ¶¶25-30).  And, unlike in *Weldon v. Kraft, Inc.*, 896 F.2d 793, 796, 799 (3d Cir. 1990), where the plaintiff provided both testimony that his supervisor "had a history of difficulties with black trainees" and percentages arguably showing that minorities made up "a disproportionate amount" of involuntary terminations by the employer, Plaintiff has not provided any specific testimony showing racial animus on the part of his supervisors and provides no evidence as to the proportionality of the discharges of the five black employees.

Therefore, even if the Court considers the evidence in the light most favorable to him, Plaintiff has not succeeded in showing that Defendant's proffered reasons were in fact pretext. Therefore, Plaintiff has failed to meet his burden of persuasion on the Title VII claim, and said claim is dismissed, with prejudice.

### B.    *Plaintiff's ADEA Claim*

A similar analysis is applied to Plaintiff's ADEA discrimination claim.  But the United States Supreme Court has recently clarified that, unlike Title VII, the ADEA does not allow "mixed motives" claims and therefore the plaintiff must show that age discrimination was the

determinative reason, the "'but-for' cause," of his termination, not just one of a number of motivating reasons. *See Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2350 (2009).[12] In the present case, however, since the Title VII claim was a "pretext" claim, there is little difference in the analyses.

Once again, the first two steps of the *McDonnell Douglas* analysis are straightforward. Plaintiff established a prima facie case by showing that he was: 1) over 40 years old at the time of his termination and therefore a member of a protected class for ADEA purposes (Docket Nos. 30 at ¶38; 33 at ¶38);  2) qualified for the position; 3) discharged; and 4) not treated the same as others not in the protected class.  And Defendant's legitimate nondiscriminatory reasons for its decision to terminate Anderson are sufficient in the ADEA context as they were in the Title VII context.

The third phase of *McDonnell Douglas* proceeds according to the two-pronged *Fuentes* analysis in ADEA cases, just as in Title VII cases.  *See Connolly*, Civ A. No. 06-1462, WL 3154445 (3d. Cir. Sep. 8, 2009).  Therefore, Plaintiff must "*either* (i) discredit[] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely [than] not a . . . determinative cause of the adverse employment action." *Fuentes*, 32 F.3d, 764.

---

[12]

     In *Gross,* the United States Supreme Court also called into question whether *McDonnell Douglas* applies to ADEA claims at all. *Gross*, 129 S.Ct. at 2349 n. 2 ("[T]he Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp. v. Green,* utilized in Title VII cases is appropriate in the ADEA context.").  However, the Court of Appeals for the Third Circuit has traditionally applied it, and did not change its practice after *Gross*. C*onnolly v. Pepsi Bottling Group, LLC.*, Civ A. No. 06-1462, WL 3154445 (3d. Cir. Sep. 8, 2009) (unpublished opinion, citing *Gross* and upholding the district court's application of *Fuentes* and *McDonnell Douglas* to an ADEA case).  Accordingly, the Court will apply it.

1.      *FUENTES* PRONG 1, DISCREDITING THE PROFFERED REASONS

Since the analysis under the first prong of *Fuentes* is specific to the employer's proffered reasons themselves and to the employer's implementation of them, there is no difference between its application in the Title VII context and the ADEA context.  Thus, the discussion in section V.A.1. *supra* applies here as well.  The Court therefore turns to the second prong of *Fuentes* to examine whether Plaintiff has shown that discrimination was more likely the cause of his termination.

2.      *FUENTES* PRONG 2, OTHER EVIDENCE OF DISCRIMINATION

Unlike in the Title VII context, Plaintiff must show that his age was a *determinative* factor in Defendant's decision to terminate him, not just that it was one of a number of motivating factors.  *Gross*, 129 S.Ct. 2343, 2350 (2009).  Thus, Plaintiff bears a higher burden with regards to this claim; to show pretext at this stage he must proffer sufficient evidence for a reasonable jury to find that discrimination was the "but for" cause of his termination or, put another way, that Defendant's proffered reasons would not have resulted in his termination absent improper consideration of his age.

Plaintiff has proffered sufficient evidence to show that age was *a* factor in his termination, but not to show that it was a *determinative* one.  Plaintiff's evidence is largely circumstantial, but it is sufficient for a jury to find that age played a role in the decision to terminate Plaintiff.  First, Plaintiff can point to the same group of comparators discussed in the Title VII context, *supra*. Of the 23 employees adduced by Defendant as comparators, five were older than Anderson at the time of their termination, and 13 were over 40 years old.  (Docket Nos. 23 at ¶59; 28 at ¶59).  Of the six employees adduced by Plaintiff as comparators, all six

were over 40 years old.  (Docket No. 28 at ¶¶57, 59).[13]  Second, it is uncontested that Equitable was in the process of eliminating Customer Serviceman positions through attrition at the time and that the recent changes in the retirement program for Customer Servicemen would have made Anderson eligible for retirement with a full pension, giving Defendant a financial motivation to terminate older employees.  (Docket Nos. 30 at ¶¶33-38; 33 at ¶¶33-38).  A reasonable jury could examine this evidence in the light most favorable to the Plaintiff and determine that Plaintiff's age was at least one of the factors in Equitable's decision to terminate him.

However, just because age may have played a role in the decision does not mean that it was a "but for" cause of his termination.  A jury could not reasonably find that Equitable would not have fired Anderson, were it not for his age.  As discussed above, Defendant has proffered a number of reasons for Plaintiff's dismissal, including Anderson's violation of company policies, most notably the Conflicts of Interest policy (which, by its terms, Plaintiff did violate) and his apparent theft from the company.  Since violation of a company policy and theft from the company would normally be sufficient reasons for the termination of an employee, and since Plaintiff cannot show that such violations were not normally grounds for termination (*see* Section V.A.1. *supra*), it would not be reasonable for a jury to conclude that Defendant's proffered reasons could not by themselves account for Plaintiff's dismissal.

Thus, even if the Court considers the evidence in the light most favorable to him, Plaintiff has not succeeded in showing that Defendant's proffered reasons were pretexts that

---

[13]

Defendant points out that over 82% of its customer servicemen were over 40 years old at the time.  (Docket No. 33 at ¶¶25-30).

would not have resulted in his dismissal, and therefore he fails to meet his burden of persuasion as to the ADEA claim, and it is dismissed, with prejudice.

**VI.     Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket No. 22) is GRANTED.  Both of Plaintiff's claims are dismissed, with prejudice.

Appropriate orders follow.


s/ Nora Barry Fischer
Nora Barry Fischer
United States District Judge


Dated:  December 4, 2009
cc/ecf:  All counsel of record.